Sophia Goren Gold (SBN 307971)
*sgold@kalielgold.com*
Amanda J. Rosenberg (SBN 278507)
*arosenberg@kalielgold.com*
**KALIELGOLD PLLC**
490 43rd Street, No. 122
Oakland, California 94609
Telephone: (202) 350-4783

Jeffrey D. Kaliel (SBN 238293)
*Jkaliel@kalielpllc.com*
**KALIELGOLD PLLC**
1100 15th Street NW, 4th Floor
Washington, D.C. 20005
Telephone: (202) 350-4783

*Attorneys for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEORGE TSOURDINIS, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ALPHABET, INC., and GOOGLE LLC,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff George Tsourdinis ("Plaintiff"), by and through counsel, brings this Class Action Complaint against Defendants Alphabet, Inc. and Google LLC (collectively, "Defendants" or "Google"), individually and on behalf of all others similarly situated, and alleges, upon personal knowledge as to his own actions, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.      Plaintiff, on behalf of himself and all other similarly situated Class Members, brings this putative class action against Google arising from its unfair and deceptive scheme of designing, manufacturing, distributing, advertising, marketing, and selling its first- and second-generation Nest Learning Thermostat ("NLT") as a Wi-Fi-enabled "smart" thermostat operable through an application on the user's smart phone or other electronic device—while, at the same time, failing to disclose that the NLT's advertised functionality would only operate at Google's corporate whim and could be discontinued by Google at any time. Google never told consumers prior to purchase that the NLT's core functionality could be reduced or eliminated for any reason, at any time, without compensation to purchasers.

2.      In an effort to coerce consumers into buying a newer version of the same product, Google "bricked" the first and second generation of its NLT device by stripping the devices of functionality as remotely-controllable thermostats and their ability to receive software updates from Google—before the NLTs had reached the end of their useful life.

3.      When Google bricked the first- and second-generation NLTs, it rendered them no more "smart" than a traditional, manually-operated thermostat that no reasonable consumer would have expected to receive when they purchased the NLT.

4.      Plaintiff thus brings this action because (1) Google's bricking of the NLT constitutes an unfair business practice in violation of state consumer protection laws, (2) Google's omission that it could brick these devices by removing core software functionality long before the useful life of the hardware had expired, along with its simultaneous advertising of its NLTs as "smart' devices, deceived Plaintiff and consumers at the point of purchase, (3) Google's bricking of its devices breached the implied covenant of good faith and fair dealing in the purchase transaction by undermining the benefit of the bargain, and (4) Google's intentional and unilateral removal of all promised features, functions, and services of first- and second-generation NLTs without users' consent caused damage in violation of federal statutory law.

5.     Google's bricking of the NLT is fundamentally unfair. Indeed, as the FTC has recognized, consumers generally expect that the things they buy will work and keep working, and that includes the software necessary to make the device work. When a company unilaterally decides to make a device that it manufactured and sold stop working before the end of its physical useful life, that is unfair.

6.     Google's omission of its ability to strip the functionality of the NLT at the point of sale was also deceptive. Google failed to mention at the point of sale the potential loss of features and functions, while at the same time prominently advertising that the NLTs were "smart," provided Wi-Fi connectivity, and the ability to operate them via a smartphone app.

7.     Plaintiff and other consumers therefore reasonably believed that their NLTs would continue to function through their physical life with remote-controllability and software updates because Google never told consumers prior to purchase that this functionality could be reduced or eliminated for any reason, at any time, and without compensation to purchasers.

8.     What's worse, Google seemingly "bricked" the device to force consumers to upgrade to more recent versions of the same thermostat, thereby coercing consumers into purchasing a newer version of the same product.

9.     Plaintiff and Class Members could not have anticipated that the NLT's value and usefulness could be terminated overnight by Google, for any reason at all—though that is exactly what happened.

10.     Google also breached the implied covenant of good faith and fair dealing inherent in the purchase transaction because the fundamental basis of bargain was that, in exchange for the purchase price, Google would provide the ability to operate these devices via a smartphone app and continue essential software support for the useful life of the hardware.

11.     Plaintiff and Class Members would not have purchased the NLT or would have paid substantially less for it had they known that its core functionality was at risk of being stripped away at any time of Google's choosing—including that Google could abandon all software support, remove core functionality, and essentially render "smart" devices "dumb," before the end of their physical useful life.

12.     As a result of Google's misconduct as alleged herein, Plaintiff and the Class seek actual damages, restitution, disgorgement of profits, statutory damages, attorneys' fees and costs, public injunctive relief, and all other relief the Court deems proper.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction of this action under the Class Action Fairness Act of 2005, § 1332(d) because (1) the amount in controversy, exclusive of costs and interest, exceeds the sum of $5,000,000.00; (2) the proposed Class is comprised of at least 100 members; and (3) at least one of the members of the proposed Class is a citizen of a different state than Defendants.

14.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants are subject to personal jurisdiction here and regularly conduct business in this District and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## PARTIES

15.    Plaintiff is and was, at all relevant times alleged herein, a citizen of the State of Illinois, and currently resides in Illinois. Plaintiff purchased a first-generation NLT from third-party retailer Home Depot in 2011.

16.    Defendant Alphabet, Inc. ("Alphabet") is a corporation formed and existing under the laws of Delaware with its headquarters located in Mountain View, California. Defendant Alphabet is the parent company of Defendant Google LLC.

17.    Defendant Google LLC is a subsidiary of Alphabet and a limited liability company organized under the laws of Delaware. Defendant Google LLC designs, manufactures, distributes, advertises, markets, and sells a line of "Smart Home" devices under the "Google Nest" brand name, including the NLT device at issue in this Complaint.

## FACTUAL ALLEGATIONS

### I.    Google Launches the NLT and then Renders First- and Second-Generation NLTs Obsolete

18.    In October 2011, Google launched the first generation of the NLT, which it positioned as a Wi-Fi-enabled "smart" thermostat that automatically creates customized heating and cooling schedules by learning the user's preferred temperatures, habits, and home efficiency over time. In October 2012, Google launched a second-generation version of the NLT.

19.    On its website, in online advertisements, and through third-party retailers, Google marketed the first- and second-generation NLT as a thermostat that users could "[c]ontrol from anywhere" using their mobile devices. Specifically, Google advertised the NLT as able to connect to Google's proprietary

app, from which users could set their home's temperature using the NLT and change other settings on the device.



CLASS ACTION COMPLAINT

20.     Coinciding with Google's launch of the second generation of the NLT in October 2012, Google issued a blog post on its website on October 2, 2012.[1] The blog post boasted a bevy of new software features included with the second-generation NLT, including "enhanced Auto-Away," "more languages" "Auto-Schedule in Heat," "Cool mode," Android tablet connectivity, "System Match technology," "True Radiant," "Heat Pump Balance," "Early-On," and "Filter Reminders."

21.     In the blog post, Google twice acknowledged its "promise" to first- and second-generation NLT customers to provide—and keep providing—software updates and connectivity for the NLT:

> Today we're introducing a new Nest Learning Thermostat. New hardware, new software, new features, more compatibility, more apps, more beautiful, more tailored for you and your home.
>
> We're incredibly proud of the 2nd generation Nest thermostat. We're also proud that we're keeping our promise to 1st generation Nest customers. **We told them that their Nest would keep getting better, and we meant it. So every Nest owner with a Wi-Fi connected Nest will be updated to the same 3.0 software as the new Nest in the next few days**.
>
> …

---

[1] https://blog.google/products-and-platforms/products/nest/next-generation-nest-thermostat/.

We also want to make sure we fulfill our promise to our customers to keep improving their Nest, so every Wi-Fi connected new and existing Nest thermostat will get 3.0 software too.[2]

22.    But the "promise" was broken. In April 2025, Google abruptly announced that, beginning October 25, 2025, it would discontinue software updates for first- and second-generation NLTs and prevent users from being able to these NLTs with their mobile devices.

23.    As of today, all first- and second-generation NLTs have been stripped of all Wi-Fi connectivity. Although users can still adjust the temperature on their NLTs manually, they are no longer able to do so via their mobile devices, rendering these once "smart" devices no better than an ordinary thermostat. Nor are users able any longer to take advantage of the app-based features that came included with their purchase of the NLTs (and were heavily advertised by Google), including "Home/Away Assist," which automatically adjusted the device's temperature based on the user's phone's location; "Filter Reminder," which notified users on their mobile devices when a filter replacement for their NLT was needed; and an "Energy History" feature that allowed users to monitor their energy usage over time on their mobile devices, as measured by the NLT (collectively, the "Discontinued Features").

24.    Even worse, Google no longer provides its now-bricked NLTs with software or security updates. Google acknowledges that, without these updates, the NLTs may have "decreased performance with continued use."

25.    By these actions, Google has rendered these NLTs essentially bricks compared to the feature-rich, remotely controllable devices consumers originally purchased, which were sold at a high price point.

## II.    Google's Omissions and Contradictory Advertising

26.    During the entire period that Google sold the first- and second-generation NLTs, it uniformly omitted at the point of purchase that their software functionality could become obsolete long before the useful life of the hardware of the devices.

27.    While omitting at the point of sale that it could remove support for core software that enabled users to remotely control their devices, Google made representations that were contrary to the

---

[2] *Id.* (emphasis added).

CLASS ACTION COMPLAINT

omission of the potential time limitation of its software by touting its "promise" that the NLTs would receive ongoing software support.

28.    Representations that were contrary to Google's omission that the software supporting the functionality of the NLTs could be gutted long before their useful life include Google's touting of the features and convenience of its proprietary app for remote control of the NLT, a device it represented could be "[c]ontrol[ed] from anywhere" right on its packaging.

29.    Google had a duty to disclose the potential loss of features and functions of its NLTs because, at the point of purchase, it advertised the NLTs as having these software-based functions.

30.    The devices' continued software functionality also formed the fundamental basis of the bargain: consumers would pay a premium for an expensive electronic device, and in return, they would receive a device capable of remote controllability and a host of premium, app-based features not typically available with a conventional thermostat.

31.    Google's misrepresentations and omissions were also made on major retailers' websites, including Google's own website, Home Depot, and Amazon.

32.    Consumers were not informed at or before the time of purchase that the NLTs' core functionality could be reduced or eliminated for any reason, at any time, without compensation to purchasers, even when the physical device continued to function.

33.    Consumers reasonably understood that the first- and second-generation NLTs would continue to function as advertised throughout their useful life.

34.    Google has not issued refunds to any consumers for their bricked first- and second-generation NLTs.

35.    Instead, Google has done the opposite, by actively encouraging consumers with the first- and second-generation NLTs to buy new NLT devices, and spend even more money on a newer version of the same product.

**III.    Google's Intentional Discontinuance of the Core Features of the First- and Second-Generation NLTs Constitutes an Unfair "Software Tethering" and "Bricking" Practice**

36.    Manufacturers are incentivized to render devices obsolete so that they can manufacture and sell new ones. Increasingly, by failing to support otherwise functional devices with software functionality

included at sale, companies like Google unilaterally, and, prematurely, decide that devices are obsolete even though the actual hardware of the device itself has not run its useful life and functions perfectly. Left with a device that is either useless or with less software functionality, consumers are forced to buy updated devices—often from the same manufacturers.

37.     In a recent staff report, the Federal Trade Commission ("FTC") acknowledged the harm that results when manufacturers cut back on making software updates to "smart" products like the NLT, eventually turning those products in non-functional "bricks" with limited to no use. As the FTC explains, the failure to provide software and the failure to disclose the duration of software support is a deceptive practice that causes consumer harm that they cannot avoid:

> Manufacturers marketing a device as having certain features and then subsequently failing to provide software updates needed to maintain those features raises concerns about consumer harm resulting from deceptive practices. A representation, omission or practice is deceptive and violates the FTC Act if it is material and likely to mislead a consumer acting reasonably under the circumstances. Thus, if a manufacturer makes an express or implied representation regarding how long the product will function or be useable, it may be a deceptive practice if the manufacturer fails to disclose how long it will provide necessary software updates.

> Similarly, the failure to provide software updates or the failure to disclose the duration of software support raises concerns about harm consumers cannot avoid. A practice is unfair and violates the FTC Act if it is likely to cause substantial injury that could not be reasonably avoided by consumers and the injury is not outweighed by any offsetting consumer or competitive benefits that the sales practice also produces. Thus, when evaluating a manufacturer's failure to provide updates or its failure to disclose the duration of software support it is appropriate to consider the scope of injury caused by the failure, whether this injury is reasonably avoidable by consumers, and whether there may be any offsetting benefits arising from the failure to provide software updates or disclosures about the duration of software support.[3]

38.     The staff report builds on a prior blog post by the FTC that noted, "there are serious issues at play when consumers purchase products that unexpectedly stop functioning due to a unilateral decision by the company that sold it. Consumers generally expect that the things they buy will work and keep

---

[3] *Smart Device Makers' Failure to Provide Updates May Leave You Smarting,* FTC Staff Perspective, Nov. 2024, available at  https://www.ftc.gov/system/files/ftc_gov/pdf/smart-device-makers-failure-to-provide-software-updates-may-leave-you-smarting.pdf [https://perma.cc/EW9W-TENT].

working, and that includes any technical or other support necessary for essential functioning."[4]

39.    Non-profit organization, Truth in Advertising ("TINA"), similarly acknowledged this practice as an increasingly prevalent false advertising practice it calls "software tethering," "which is when a manufacturer uses software to control how a connected device functions after purchase, if it continues to function at all," and may range from "taking away features that were advertised at the time of purchase or completely 'bricking' a device through software updates[.]"[5]

40.    Consumer Reports also highlighted the concern behind companies' lack of transparency in disclosing the lifespan of a connected smart device before consumers commit to purchasing:

> The refusal to disclose how long a consumer can expect their connected appliances to stay secure and retain the exciting software-based functions that a consumer may have paid extra for is an example of how efforts to turn everyday devices into internet-connected computers have left a regulatory loophole that allows manufacturers to infringe on a consumers' ability to truly own a product. . . .
>
> And consumer should know when this potential loss of features or functions will happen before they plunk down their hard-earned cash on a device or appliance. Only when consumers can see how long a manufacturer plans to stand by a connected product can they make an informed decision about what they are spending their money on. Absent this information, a consumer could spend thousands on a large appliance, only for the features they rely on to stop working in a few years.[6]

41.    In response to this rapidly growing harm, Consumer Reports and several other groups have called on the FTC "to create clear guidance to address the issue of software tethering which leads to several consumer harms, including . . . companies selling connected devices only to render them nonfunctional later using software." This practice of "'bricking' a connected device purchased by a consumer in many cases [is an] unfair and deceptive practice[.]"[7]

---

[4] *What Happens When the Sun Sets on a Smart Product?*, FTC Business Blog, July 13, 2016, available at https://www.ftc.gov/business-guidance/blog/2016/07/what-happens-when-sun-sets-smart-product

[5] *2025 Deceptive Ad Trends,* Consumer News, Truth in Advertising.org, Jan. 6, 2025, available at https://truthinadvertising.org/articles/2025-deceptive-ad-trends/ [https://perma.cc/J2B2-TKAV].

[6] *When Will Your Smart Appliance Turn Dumb? A Lack of Transparency Leaves Consumers in the Dark,* Consumer Reports, Sept. 25, 2024, available at https://innovation.consumerreports.org/when-will-your-smart-appliance-turn-dumb/ [https://perma.cc/49A9-YQFF].

[7] FTC Letter, Sept. 5, 2024, available at https://advocacy.consumerreports.org/research/group-letter-ftc-software-tethering/ [https://perma.cc/GKS7-SSNQ].

CLASS ACTION COMPLAINT

42. The FTC Letter explains "how companies are using software tethers in their devices to infringe on a consumer's right to own the products they buy."[8] "This software-server connection tethers the device to the manufacturer, giving the manufacturer post-purchase control of the software and changing the nature of ownership."[9] As a result, "[c]onsumers increasingly face a death by a thousand cuts as connected products they purchase lose their software support or advertised features that may have prompted the original purchase."[10]

43. Additional recent examples of software "bricking" in the consumer marketplace include Spotify's connected Car Thing device that lasted only 22 months, the iKamand temperature regulating device that was discontinued within the same year, Google's Dropcam cameras, and Amazon's Halo health and wellness wearable devices, to name a few.[11]

## IV.    Online Consumer Complaints About Google's Bricking of the NLT

44. Google is well aware of widespread consumer dissatisfaction because of its unilateral decision to brick first- and second-generation NLTs.

45. Below is just a small sampling of the online consumer complaints about this issue:

a. "I got my Nest gen 1 as soon as it came out. I was on the original waiting list. I knew when Google bought it, they would ruin it. How can they take away our app functionality? It's already there, why remove it? That's what I paid for." (Reddit)

b. "It is super disappointing that a thermostat that works just fine is no longer going to be working with the app. Please, Google, do what Sonos did and separate out an older version of the Nest app to work with legacy thermostats. We've had our Nest gen 2 thermostat for 10 years. This lack of continued support and low lifespan makes me very hesitant to purchase any more google products." (Change.org)

c. "I am writing to express my deep frustration regarding Google's recent decision to end support for the 1st generation Nest Thermostat. As a long-time user who has relied on this product for over a decade, I am disheartened by the impact this has on my home's heating and cooling efficiency. Living in a two-story house, I've experienced significant temperature variances between floors, making the Wi-Fi functionality of the Nest critical for my comfort. Being able to monitor and adjust the temperature remotely has allowed me to maintain a consistent climate in my home, especially as I spend most of

---

[8] *Id.*

[9] *Id.* (citations omitted).

[10] *Id.*

[11] *Id.* (citations omitted).

CLASS ACTION COMPLAINT

my time upstairs. This adjustment capability is no longer possible with the loss of internet connectivity. It's not simply inconvenient; it's a considerable disruption. Thermostats are not appliances that can be easily swapped out." (Change.org)

d.    "Got screwed by Google. I bought my Nest Thermostat in 2011 and it functioned well using the Nest App, with no problems, up until October the 25th. I had received an email from Google telling me that my Nest system would no longer work after this date. They suggested that I should upgrade, OK ! I tried ,only to find out that my particular device could no longer be upgraded. However when I contacted the help line I was informed that I would have to buy the new version of the thermostat, at a cost of over $600. There was a discount. Woopee!" (Facebook)

e.    "So Google Nest decided to no longer support their thermostats, of which I have two. I also have 7 temperature sensors (one for each room) so that the thermostats could be controlled by the temperature of a certain room (such as a nursery). Instead of just no longer supporting the devices, they remotely triggered a destruct so that WIFI no longer works to control the devices. That would be like Microsoft remotely disabling your Windows 10 machine now that support has ended!! This action makes Microsoft look like a good guy. I am disgusted. What if they do the same to my 8 security cameras? They want me to buy one of their new Google devices. They are being so generous as to give me a discount. It's nothing more than a money-grab. They can go fly. Not one more penny from me." (Facebook)

46.    Indeed, public outcry over Google's decision to brick first- and second-generation NLTs has been so overwhelming that several NLT customers launched an online petition to persuade Google to allow users to "maintain basic functionalities" of the devices. The petition has thus far collected over 700 verified signatures.[12]

## V.    Plaintiff's Experience

47.    Plaintiff purchased a first-generation NLT from third-party retailer Home Depot in 2011.

48.    Plaintiff purchased the NLT after being exposed to, and relying on, marketing characterizing the NLT as a thermostat that could be controlled from anywhere using Google's proprietary app, that included the Discontinued Features discussed above, and that would receive continuing software support from Google.

49.    Plaintiff was not informed at or before the time of purchase that the NLT's core

---

[12] Let Nest Thermostats Keep Working, Change.org, available at https://www.change.org/p/let-nest-thermostats-keep-working?recruiter=727641293&recruited_by_id=07520020-475b-11e7-9d4a-8f965663b1c8&utm_source=share_petition&utm_campaign=starter_onboarding_share_social&utm_medium=twitter (last visited February 11, 2026).

CLASS ACTION COMPLAINT

functionality could be reduced or eliminated for any reason, at any time, without compensation to purchasers even when the physical device continued to function.

50.     Plaintiff reasonably relied on Google's misrepresentations and omissions (i) because Google did not tell him prior to purchase that the NLT's software functionality would be time limited and disabled at Google's discretion long before the useful life of the hardware of the device had expired and (ii) because, at the point of purchase, Google advertised features to him without any time limitation— including the NLT's remote controllability, ongoing software support, and the Discontinued Features, all of which were important to his decision to purchase the NLT.

51.     Plaintiff would not have purchased an NLT, or would have paid substantially less for it, had he known that Google could reduce or eliminate the device's core functionality for any reason, at any time, without compensation to purchasers even when the physical device continued to function.

## CLASS ALLEGATIONS

52.     Pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), Plaintiff brings this action individually and on behalf of proposed Classes of similarly situated persons defined as follows:

**Nationwide Class**: All persons who reside in the United States who purchased a first- or second-generation NLT and still owned the device as of October 25, 2025.

**Illinois Subclass**: All persons who reside in Illinois who purchased a first- or second-generation NLT and still owned the device as of October 25, 2025.

53.     Excluded from the Classes are Defendants' current or former officers, directors, and employees; counsel for Plaintiff and Defendants; and the judicial officer to whom this lawsuit is assigned.

54.     Plaintiff reserves the right to modify or amend the definitions of the Classes as this litigation proceeds.

55.     **Numerosity and Ascertainability**: The members of the Classes are so numerous that joinder of all members is impracticable. Plaintiff is informed and believes that the proposed Classes contain at least thousands of individuals who have been damaged by Defendants' conduct as alleged herein. The precise number of Class Members is unknown to Plaintiff at this time, but Plaintiff anticipates that the number and identities of Class Members are administratively feasible and can be determined through appropriate discovery in the possession of Defendants and/or third-party retailers.

CLASS ACTION COMPLAINT

56.    **Existence and Predominance of Common Questions of Law and Fact**: This action involves common questions of law and fact which predominate over any questions affecting individual Class Members. These common and legal factual questions include, but are not limited to, the following:

a.    Whether Defendants' first- and second-generation NLTs were improperly "bricked";

b.    Whether Defendants' first- and second-generation NLTs were forced into obsolescence by Defendants;

c.    Whether Defendants' alleged misconduct constitutes violations of the laws asserted herein;

d.    Whether Plaintiff and Class Members have sustained monetary loss and the proper measure of that loss; and

e.    Whether Plaintiff and Class Members are entitled to other appropriate remedies.

57.    **Typicality**: Plaintiff's claims are typical of the members of the Classes because, *inter alia*, all Class Members have been deceived (or were likely to be deceived) and have suffered similar injury by the same wrongful practices by Defendants. Plaintiff's and Class Members' claims all arise from the same wrongful practices and course of conduct and are based on the same legal theories of liability.

58.    **Adequacy**: Plaintiff will fairly and adequately protect the interests of Class Members. Plaintiff has retained counsel experienced in complex consumer class action litigation and intends to prosecute this action vigorously. Plaintiff has no antagonistic or adverse interests to those of the Classes.

59.    **Superiority**: A class action is superior to other methods for resolving this controversy. Because the amount of restitution, damages, and/or penalties to which Class Members may be entitled is low in comparison to the expense and burden of individual litigation, it would be impracticable for Class Members to redress the wrongs done to them without a class action forum. Furthermore, on information and belief, many Class Members do not know that their legal rights have been violated. Class Members would also conserve judicial resources and void the possibility of inconsistent judgments.

## <u>CAUSES OF ACTION</u>

### <u>FIRST CAUSE OF ACTION</u>
#### <u>Breach of Contract Including Breach of the Implied Covenant of Good Faith and Fair Dealing</u>
#### <u>(On Behalf of Plaintiff and the Nationwide Class and Illinois Subclass)</u>

60.    Plaintiff repeats and incorporates all the preceding allegations as if fully set forth herein.

61.    Plaintiff and Class Members entered into a contract with Google when they purchased their NLTs.

62.    Google breached the contract when it "bricked" the devices, stripped them of functionality, and deprived them of the functions they were advertised to have at the point of sale.

63.    In addition, a covenant of good faith and fair dealing is implied by law in all contracts and requires that Google exercise contractual discretion honestly and in good faith. The covenant of good faith and fair dealing requires that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain.

64.    Google breached the covenant of good faith when it exercised its discretion to unilaterally and intentionally dismantle nearly all features of the NLTs, as described above, rendering the devices largely obsolete far before their physical useful life. In so doing, Google undermined Plaintiff and Class Members' right to receive the benefit of the bargain.

65.    Plaintiff and Class Members have performed or substantially performed all obligations imposed on them under the contract.

66.    Plaintiff and Class Members have sustained damages as a direct result of Google's breach of the contract and breach of the implied covenant of good faith and fair dealing.

**SECOND CAUSE OF ACTION**
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (the "ICFA")**
**815 ILCS 505/1, _et seq._**
**(On Behalf of Plaintiff and the Illinois Subclass)**

67.    Plaintiff repeats and incorporates all the preceding allegations as if fully set forth herein.

68.    Defendants are "persons" as defined in 815 ILCS 505/1(c).

69.    Plaintiff and Class Members are "consumers" as defined in 815 ILCS 505/1(e).

70.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material

fact . . . in the conduct of trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

71.     Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the ICFA, through both their affirmative misrepresentations and material omissions as alleged herein.

72.     Defendants intentionally and knowingly engaged in these unfair and unlawful practices. Google knew that Plaintiff and Class Members could not reasonably be expected to learn of Google's intent to "brick" the NLTs until such action occurred.

73.     Defendants knew or should have known that its conduct violated the ICFA, as it should have known that its misrepresentations and omissions were false.

74.     Defendants' unfair or deceptive acts and practices were likely to and did in fact deceive consumers, including Plaintiff.

75.     Plaintiff relied on Google's misrepresentations and omissions as discussed above.

76.     Plaintiff and Class Members would not have purchased the NLTs or would have paid substantially less for them, but for Defendants' misrepresentations and omissions.

77.     Plaintiff and Class Members suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and their concealment of and failure to disclose material information.

78.     Defendants' violations present a continuing risk to Plaintiff, Class Members, and the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

79.     Pursuant to 815 ILCS 505/10a(a), Plaintiff and the Illinois Subclass seek monetary relief against Defendants in the form of actual damages as well as punitive damages because Defendants acted with fraud and/or malice and/or were grossly negligent.

80.     Plaintiff also seeks attorneys' fees and an order enjoining Defendants' unfair and deceptive acts or practices, and any other relief available under 815 ILCS 505/1 *et seq.*

**THIRD CAUSE OF ACTION**
**Violation of California's Unfair Competition Law (the "UCL"), Unfair Prong**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***
**(On Behalf of Plaintiff and the Nationwide Class)**

81.     Plaintiff repeats and incorporates all the preceding allegations as if fully set forth herein.

82. Defendants' unlawful conduct emanated from its headquarters in California and therefore it is appropriate to apply California law on behalf of the Nationwide Class. Additionally, without conceding any choice of law provision is valid and enforceable here, to the extent any choice of law provision is enforced, California law applies.

83. California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair, or fraudulent business act or practice." Google's conduct related to deceptively representing that the NLTs provide features, capabilities, services, and uses violates the statute's "unfair" prong.

84. The UCL imposes strict liability. Plaintiff need not prove that Google intentionally or negligently engaged in unfair business practices—only that such practices occurred.

85. A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications, and motives of the practice against the gravity of the harm to the alleged victims.

86. Google committed unfair business acts and practices in violation of Cal. Bus. & Prof. § 17200, *et seq.*, by stripping its NLTs of essentially all functionality, long before the expiration of their useful life, a practice known as "bricking."

87. "Bricking" has been specifically called out by the FTC as a potentially unfair business practice because consumers have no choice in the matter.

88. As explained by the FTC, the "failure to provide software updates or the failure to disclose the duration of a product's software support" constitutes "unfair" conduct and "violates the FTC Act" because it results in unavoidable harm to consumers and causes them substantial injury.

89. Google's affirmative action of stripping its devices of their ability to function before the expiration of their useful life imposes a financial detriment to consumers while benefitting Google.

90. Google caused consumers substantial injury by charging a premium for the NLTs' software features and then discontinuing access to that same software, causing consumers to lose money as a result. The substantial injury to consumers outweighs any countervailing benefit to Google. Defendants' acts and practices constitute immoral, unethical, oppressive, and unscrupulous activities that are substantially

injurious to consumers.

91.    The harm to Plaintiff and the Class outweighs the utility of Defendants' practices. There were reasonably available alternatives to further Defendants' legitimate business interests, other than the unfair conduct described herein.

92.    Had Plaintiff and Class Members known that Defendants would render their devices less functional by removing many of their features, they would have paid less for the devices or would not have purchased them at all.

93.    As a direct and proximate result of Google's unfair practices, Plaintiff and Class Members have suffered damages.

94.    Google has been unjustly enriched and should be required to disgorge its unjust profits and make restitution to Plaintiff and Class Members pursuant to Cal. Bus. & Prof. Code § 17203 and 17204.

95.    **Inadequate remedy at law.** Legal remedies available to Plaintiff and Class Members are inadequate because they are not as equally prompt and certain and in other ways as efficient as equitable relief. Damages are not equally certain as restitution because the standard that governs restitution is different than the standard that governs damages. Hence, the Court may award restitution even if it determines that Plaintiff and Class Members fail to sufficiently adduce evidence to support an award of damages. Damages and restitution are not necessarily the same amount. Unlike damages, restitution is not limited to the amount of money Defendants wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles a plaintiff to recover all profits from the wrongdoing, even where the original funds taken have grown far greater than the legal rate of interest would recognize. Legal claims for damages are not equally certain as restitution because claims under the statutes herein entail few elements. In short, significant differences in proof and certainty establish that any potential legal claim cannot serve as an adequate remedy at law. Due to these differences in proof and certainty, equitable relief is appropriate because Plaintiff may lack an adequate remedy at law for damages. Even if legal remedies may be available, Plaintiff seeks equitable remedies in the alternative to legal ones, which are yet uncertain.

96.    Legal remedies available to Plaintiff and Class Members are also inadequate because they do not address likely future harms. As of the date of this filing, Google has failed to restore software functionality for first- and second-generation NLTs. If Google is not ordered to take these or similar

actions, Google will continue to injure Plaintiff and Class members through the misconduct alleged herein.

97.    Plaintiff's and Class Members' claims are cognizable under the UCL because Defendants designed, manufactured, distributed, advertised, marketed, and sold the NLTs from Google's California headquarters.

**FOURTH CAUSE OF ACTION**
**Violation of California's Unfair Competition Law (the "UCL"), Fraudulent Prong**
**Cal. Bus. & Prof. Code §§ 17200, _et seq._**
**(On Behalf of Plaintiff and the Nationwide Class)**

98.    Plaintiff repeats and incorporates all the preceding allegations as if fully set forth herein.

99.    Defendants' unlawful conduct emanated from its headquarters in California and therefore it is appropriate to apply California law on behalf of the Nationwide Class. Additionally, without conceding any choice of law provision is valid and enforceable here, to the extent any choice of law provision is enforced, California law applies.

100.    California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair, or fraudulent business act or practice." Google's conduct related to deceptively representing that its NLTs provide features, capabilities, services, and uses violates the statute's "fraudulent" prong.

101.    The UCL imposes strict liability. Plaintiff need not prove that Google intentionally or negligently engaged in fraudulent business practices—only that such practices occurred.

102.    A business practice is "fraudulent" under the UCL if it is likely to deceive members of the public.

103.    Google committed fraudulent business acts and practices in violation of Cal. Bus. & Prof. § 17200, _et seq_., by their misrepresentations and omissions as described above.

104.    Plaintiff and Class Members acted reasonably when they relied on Google's misrepresentations and omissions in purchasing their devices.

105.    Had Plaintiff and Class Members known that Defendants would render the NLTs less functional by removing many of their features, they would have paid less for the devices or would not have purchased them at all.

106.    As a direct and proximate result of Google's fraudulent practices, Plaintiff and Class

1   Members have suffered damages.

2   107.    Google has been unjustly enriched and should be required to disgorge its unjust profits and

3   make restitution to Plaintiff and Class Members pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204.

4   108.    **Inadequate remedy at law**. Legal remedies available to Plaintiff and Class Members are

5   inadequate because they are not as equally prompt and certain and in other ways as efficient as equitable

6   relief. Damages are not equally certain as restitution because the standard that governs restitution is

7   different than the standard that governs damages. Hence, the Court may award restitution even if it

8   determines that Plaintiff and Class Members fail to sufficiently adduce evidence to support an award of

9   damages. Damages and restitution are not necessarily the same amount. Unlike damages, restitution is not

10  limited to the amount of money the defendant wrongfully acquired plus the legal rate of interest. Equitable

11  relief, including restitution, entitles a plaintiff to recover all profits from the wrongdoing, even where the

12  original funds taken have grown far greater than the legal rate of interest would recognize. Legal claims

13  for damages are not equally certain as restitution because claims under the statutes herein entail few

14  elements. In short, significant differences in proof and certainty establish that any potential legal claim

15  cannot serve as an adequate remedy at law. Due to these differences in proof and certainty, equitable relief

16  is appropriate because Plaintiff may lack an adequate remedy at law for damages. Even if legal remedies

17  may be available, Plaintiff seeks equitable remedies in the alternative to legal ones, which are yet uncertain.

18  109.    Legal remedies available to Plaintiff and Class Members are also inadequate because they

19  do not address likely future harms. As of the date of this filing, Google has failed to restore software

20  functionality for first- and second-generation NLTs. If Google is not ordered to take these or similar

21  actions, Google will continue to injure Plaintiff and Class members through the misconduct alleged herein.

22  110.    Plaintiff's and Class Members' claims are cognizable under the UCL because Defendants

23  designed, manufactured, distributed, advertised, marketed, and sold the NLTs from Google's California

24  headquarters.

25  **FIFTH CAUSE OF ACTION**
    **Violation of California's Unfair Competition Law (the "UCL"), Unlawful Prong**
26  **Cal. Bus. & Prof. Code §§ 17200, *et seq.***
    **(On Behalf of Plaintiff and the Nationwide Class)**
27

28  111.    Plaintiff repeats and incorporates all the preceding allegations as if fully set forth herein.

112.    Defendants' unlawful conduct emanated from its headquarters in California and therefore it is appropriate to apply California law on behalf of the Nationwide Class. Additionally, without conceding any choice of law provision is valid and enforceable here, to the extent any choice of law provision is enforced, California law applies.

113.    California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair, or fraudulent business act or practice." Google's conduct related to deceptively representing that its first- and second-generation NLTs provide certain features, capabilities, services, and uses violates the statute's "unlawful" prong.

114.    The UCL imposes strict liability. Plaintiff need not prove that Google intentionally or negligently engaged in unlawful business practices—but only that such practices occurred.

115.    A business practice is "unlawful" under the UCL if it violates any other law or regulation.

116.    Google's conduct constitutes an "unlawful" act under the UCL, because as alleged herein, it also constitutes violations of the other statutes, such as the CLRA.

117.    As a direct and proximate result of Google's unlawful practices, Plaintiff and Class Members have suffered damages.

118.    Google has been unjustly enriched and should be required to disgorge its unjust profits and make restitution to Plaintiff and Class Members pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204.

119.    **Inadequate remedy at law**. Legal remedies available to Plaintiff and Class Members are inadequate because they are not as equally prompt and certain and in other ways as efficient as equitable relief. Damages are not equally certain as restitution because the standard that governs restitution is different than the standard that governs damages. Hence, the Court may award restitution even if it determines that Plaintiff and Class Members fail to sufficiently adduce evidence to support an award of damages. Damages and restitution are not necessarily the same amount. Unlike damages, restitution is not limited to the amount of money the defendant wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles a plaintiff to recover all profits from the wrongdoing, even where the original funds taken have grown far greater than the legal rate of interest would recognize. Legal claims for damages are not equally certain as restitution because claims under the statutes herein entail few elements. In short, significant differences in proof and certainty establish that any potential legal claim

cannot serve as an adequate remedy at law. Due to these differences in proof and certainty, equitable relief is appropriate because Plaintiff may lack an adequate remedy at law for damages. Even if legal remedies may be available, Plaintiff seeks equitable remedies in the alternative to legal ones, which are yet uncertain.

120.    Legal remedies available to Plaintiff and Class Members are also inadequate because they do not address likely future harms. As of the date of this filing, Google has failed to restore software functionality for first- and second-generation NLTs. If Google is not ordered to take these or similar actions, Google will continue to injure Plaintiff and Class Members through the misconduct alleged herein.

121.    Plaintiff's and Class Members' claims are cognizable under the UCL because Defendants designed, manufactured, distributed, advertised, marketed, and sold the NLTs from Google's California headquarters.

### SIXTH CAUSE OF ACTION
### Violation of California's Consumers Legal Remedies Act (the "CLRA")
### Cal. Civ. Code §§ 1770, *et seq.*
### (On Behalf of Plaintiff and the Nationwide Class)

122.    Plaintiff repeats and incorporates all the preceding allegations as if fully set forth herein.

123.    Defendants' unlawful conduct emanated from its headquarters in California and therefore it is appropriate to apply California law on behalf of the Nationwide Class. Additionally, without conceding any choice of law provision is valid and enforceable here, to the extent any choice of law provision is enforced, California law applies.

124.    Plaintiff and each Class Member are "consumers" as defined by California Civil Code § 1761(d). Defendants' NLTs are "goods" within the meaning of Cal. Civ. Code § 1761(a). Defendants' sale of the NLTs were "transactions" within the meaning of Cal. Civ. Code § 1761(e).

125.    Google violated the CLRA by engaging in the following practices proscribed by California Civil Code § 1770(a) in transactions with Plaintiff and Class Members which were intended to result in, and did result in, the sale of the NLTs:

    a.    "Representing that goods or services have . . . characteristics . . .[and] uses . . . that they do not have" (a)(5);

    b.    "Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not" (a)(16).

126.    Specifically, Google made misleading representations to consumers that the NLTs had specific features and omitted the material fact that it could strip many of the NLTs' advertised uses long before the end of their useful life.

127.    Google was under a duty to Plaintiff and Class Members to disclose that it could or would render the NLTs less functional because Google made affirmative statements to the contrary when it sold the device and touted its advertised benefits without time limitation.

128.    Google's material misrepresentations and omissions alleged herein were material to and relied upon by reasonable consumers when deciding whether to purchase the NLT or pay a lesser price for a comparable device.

129.    Had Plaintiff and Class Members known that Google would eliminate the advertised functionality of their devices, they would not have purchased them or would have paid much less for them.

130.    Plaintiff and Class Members have been damaged as a result of Google's violations of the CLRA as alleged herein.

131.    Pursuant to § 1782(a) of the CLRA, Plaintiff's counsel notified Defendants in writing by certified mail of the particular violations of § 1770 of the CLRA and demanded that it rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendants' intent to act. If Defendant fails to comply, Plaintiff will seek all available remedies. For now, Plaintiff seeks only public injunctive relief with respect to this claim.

**SEVENTH CAUSE OF ACTION**
**Violation of Computer Fraud and Abuse Act (the "CFAA")**
**18 U.S.C. § 1030, *et seq.***
**(On Behalf of Plaintiff and the Nationwide Class)**

132.    Plaintiff repeats and incorporates all of the preceding allegations as if fully set forth herein.

133.    Google's NLT device constitute "protected computers" as that term is defined in the CFAA.

134.    In or around April 2025, Google announced its intention to cease supporting first- and second-generation NLTs.

135.    On or about October 25, 2025, Google discontinued software updates for first- and second-generation NLTs and prevented users from being able to these NLTs with their mobile devices.

136.    NLT owners did not provide Google with authorization to access their NLTs for purposes

of substantially limiting the functionality, uses, and services of the NLTs.

137.    Defendant's intentional removal of Wi-Fi connectivity, all Discontinued Features, and software and security updates from the NLTs caused damage to Plaintiff and Class Members, resulting in a significantly less useful product.

138.    Defendant's intentional acts caused damage to all Google NLTs sold in the United States and caused aggregate damages in excess of $5,000,000.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Classes, respectfully requests that the Court enter judgment in his favor and against Defendants, as follows:

A.    Certifying the Classes as requested herein, appointing Plaintiff as Class Representative, and appointing his counsel as Class Counsel;

B.    Awarding monetary damages, statutory damages, and/or punitive damages where appropriate;

C.    Ordering Defendants to disgorge and make restitution of all monies Defendants acquired by means of the unlawful practices set forth above;

D.    Awarding declaratory and public injunctive relief as permitted by law or equity, including enjoining Defendants from continuing the unlawful practices as set forth herein;

E.    Ordering Defendants to distribute a refund to each Class Member;

F.    Awarding Plaintiff and Class Members their costs and expenses incurred in the action, including reasonable attorneys' fees and both pre- and post-judgment interest on any amounts awarded; and

G.    Providing such further relief as may be just and proper.

///

///

///

///

///

///

CLASS ACTION COMPLAINT

1

## JURY DEMAND

2        Plaintiff demands a trial by jury on all issues so triable.

3   Dated: March 2, 2026                **KALIELGOLD PLLC**

4                                       By:*/s/ Sophia Goren Gold*
                                            Sophia Goren Gold (SBN 307971)
5                                           *sgold@kalielgold.com*
                                            Amanda J. Rosenberg (SBNB 2788507)
6                                           *asrosenberg@kalielgold.com*
                                            490 43rd Street, No. 122
7                                           Oakland, California 94609
                                            Tel: (202) 350-4783
8

9                                           Jeffrey D. Kaliel (SBN 238293)
                                            *jkaliel@kalielpllc.com*
10                                          **KALIELGOLD PLLC**
11                                          1100 15th Street NW, 4th Floor
                                            Washington, D.C.  20005
12                                          Tel: (202) 350-4783

13                                          Phillip M. Black (SBN 308619)
14                                          **WOLF POPPER LLP**
                                            *pblack@wolfpopper.com*
15                                          845 Third Aenue
    N                                       New York, NY 10022
16                                          (212) 759-4600

17                                          *Attorneys for Plaintiff and the Putative Classes*

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT